**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| v. ) | |
| ) | |
| VILLAGE OF HINSDALE, ILLINOIS, ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

The United States of America ("United States") alleges as follows:

**I.**

**INTRODUCTION**

1. The United States brings this action against the Village of Hinsdale, Illinois (the "Village" or "Hinsdale") under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended ("FHA"), 42 U.S.C. §§ 3601–3619.

2. The Village has attempted to prohibit Trinity Sober Living, LLC ("Trinity") from operating a sober living home with ten residents in recovery from drug or alcohol addiction on the basis of disability. The Village claimed that the sober home was prohibited from operating, regardless of the number of residents it has, because it was a "commercial" land use under the Village's zoning code. This determination would have effectively precluded any group home or supported housing for persons with disabilities from operating in single-family residential districts in the Village. Furthermore, following opposition from neighbors opposed to the sober home, the Village refused to even consider Trinity's request for a reasonable accommodation under the FHA, and instead responded by filing a lawsuit to evict the sober home *the very next*

*day.* Accordingly, the Village has discriminated on the basis of disability, including by refusing to provide a reasonable accommodation, in violation of the FHA, 42 U.S.C. § 3604(f).

3. On November 13, 2020, after learning that the United States had authorized the filing of this lawsuit, the City filed a notice in *Trinity Sober Living, LLC v. Village of Hinsdale*, No. 1:19-cv-07321 (N.D. Ill.), indicating that it was withdrawing its position that a group home with three or fewer individuals is prohibited as a "commercial use" under the Village's zoning code. *See* ECF No. 65, at 2. However, the Village continues to take the position that group homes with three or more unrelated persons violate the Village's zoning code, which would effectively exclude most group homes for persons with disabilities. The Village also continues to maintain that it did not deny Trinity a reasonable accommodation, despite failing even to consider its request and responding instead with a lawsuit.

## II.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action and may grant the relief sought herein pursuant to 28 U.S.C. §§ 1331 and 1345; 42 U.S.C. § 3614(a); and 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims alleged herein occurred in this district and because defendant is located there.

## III.

## DEFENDANT

6. Defendant Village of Hinsdale is a unit of local government organized under the Constitution and laws of the State of Illinois. *See* Ill. Const. art. 7, § 1; 65 Ill. Comp. Stat. 5/1-1-1 *et seq.* The Village has the capacity to sue and be sued.

IV.

FACTUAL ALLEGATIONS

A. *Trinity Sober Living*

7. Trinity assists persons who are in recovery from alcoholism or drug addiction to achieve and maintain sobriety. It was founded in 2019 to address the lack of sufficient services and supports for persons recovering from alcoholism and drug addiction in Chicago's western suburbs. Michael Owens is the founder and CEO of Trinity.

8. Trinity's office is located at 19 North Grant Street in Hinsdale's business district. At this location, Trinity provides therapy, 12-step meetings, and other outpatient and after-care services. Trinity employs a full-time clinical director and receives referrals from a number of area hospitals and recovery programs.

9. On June 16, 2019, Trinity purchased a five bedroom, 4,000 square foot home located at 111 North Grant Street in Hinsdale, a short walk from its office. Trinity intended to use this home as a sober living home for up to ten persons in recovery from alcoholism or drug addiction. The home began operating on July 27, 2019 with one resident and a live-in house manager.

10. Sober living homes are designed to provide stable housing for persons recovering from alcoholism or drug addiction. A sober living home is typically a single-family house whose layout is intended to facilitate the development of relationships of several residents, all of whom are in recovery from alcoholism or drug addiction. Through this model, residents can avoid feelings of isolation and loneliness, which have been shown to contribute to relapse, by sharing bedrooms and having the ability to congregate and socialize in communal living spaces. These communal living arrangements encourage residents to hold each other accountable for their

actions in order to prevent relapse. A critical mass of residents is typically necessary for this model to succeed therapeutically.

11. Consistent with this model, Trinity's sober living home served between nine and ten residents in recovery from alcoholism or drug addiction from approximately November 2019 until the end of October 2020, when Trinity sold the home in Hinsdale and moved the residents to another sober home in another town. Residents shared bedrooms, cooked and ate meals together, and socialized together in the home's common rooms. Residents received services at Trinity's office one block away, although some support meetings occurred in the home.

12. Although, as of November 2020, Trinity will no longer operate a sober living home at 111 North Grant Street in Hinsdale, it wishes to open another, similarly-structured sober living home in Hinsdale, due in part to continued demand for Trinity's services in Hinsdale and because Trinity's office and therapeutic services for residents are located there.

13. As a result of being in recovery from alcoholism or drug abuse, Trinity's residents were substantially limited in one or more major life activities, including maintaining steady employment, familial relationships, and friendships, and being able to live independently without support and assistance to maintain sobriety.

14. Residents of Trinity's sober living home were asked to make a one-month minimum commitment to Trinity's recovery program. Residents typically stayed 90 days, though others stayed longer.

15. Residents of Trinity's sober living home were required to be sober upon entry, had to abstain from drugs or alcohol while living there, and were required to undergo weekly drug testing. Residents participated in a three-phase recovery program, with the first phase being the most restrictive. Once residents graduated to Phases 2 and 3, they could be granted one or

two overnight or weekend passes per month. While at the home, residents had to be awake and dressed by 9:00 A.M. on weekdays and were required to adhere to a curfew. A live-in house manager administered the sober home and the rules governing residents.

16. Trinity's sober living home had six off-street parking spaces. Residents were informed in advance that parking is limited and that they may not park overnight on the street, per Village law. As a result, many residents either did not have a car or stored their vehicles elsewhere while at Trinity.

B. *Relevant Zoning Provisions*

17. Most of Hinsdale, including 111 North Grant Street, is zoned as single-family residential. Under Hinsdale's zoning code, a "family" is "[o]ne or more persons related by blood, marriage, legal adoption, or guardianship, or not more than three (3) persons not so related, together with gratuitous guests and domestic servants, living together as a single housekeeping unit." Hinsdale Mun. Code § 12-106, *available at:* https://www.sterlingcodifiers.com/codebook/index.php?book_id=967.

18. The zoning code also allows "home occupations," meaning in-home businesses conducted by the resident, in single-family residential districts. A "home occupation" may have one non-resident employee working on site. *Id.* §§ 3-104, 9-102. The zoning code also contains no restrictions on rental housing.

19. The zoning code does not refer to or explicitly authorize group homes for persons with disabilities. The zoning code allows "transitional service facilities," which are "[a]n authorized and licensed dwelling operated by a public or private agency duly authorized and licensed by any state agency having authority to license and approve said facility that houses individuals being cared for by the agency and deemed by the agency to be capable of living and

functioning in the community and that provides continuous professional guidance." *Id.* § 12-106. Such facilities are only allowed in multifamily districts and only pursuant to a special use permit, are limited to six residents, and are subject to a spacing rule prohibiting any such facility from being located within one-quarter mile of another such facility, including those located outside the Village's boundaries. *Id.* § 4-107.

20. The zoning code does not contain a process for granting reasonable accommodations to zoning and land use laws to afford persons with disabilities an equal opportunity to use and enjoy a dwelling pursuant to the Fair Housing Act. *See* 42 U.S.C. § 3604(f)(3)(B). However, in August 2017, the Village received a request from a family to construct an accessible patio for their daughter, who uses a wheelchair. Ordinarily, requests for exceptions to land use restrictions under the zoning code are considered by the Village's Zoning Board of Appeals ("ZBA") for a variance or special use permit. The Village recognized that this process would be inappropriate for reasonable accommodations for persons with disabilities because the ZBA must consider "strict hardship standards," which are inconsistent with the standards for reasonable accommodations under the FHA. Therefore, the Village waived this requirement and referred the request to the Board of Trustees, which approved it unanimously and without a public hearing.

21. In considering the reasonable accommodation request described above, the Village recognized that "while the [Board of Trustees] has some flexibility in determining what exactly is 'reasonable' under 'reasonable accommodation,' … the spirit and intent of the law should be considered and deference given to the applicant when considering the request."

C. *The Village's Actions with Respect to Trinity's Sober Home*

22. On July 13, 2019, a resident of Hinsdale e-mailed the Village President, Thomas Cauley, stating that "men dealing with drug and alcohol addiction" would be living at 111 North Grant Street. The resident informed Mr. Cauley that many of his neighbors were "very worried" about "having people with these issues living as a group in our neighborhood. Any restrictions on this within proximity to Monroe Elementary?"

23. Around this time, other neighbors approached Mr. Owens at 111 North Grant Street to express their concern about persons in recovery from alcoholism and drug addiction living there. One neighbor (not the individual referenced above) accused Mr. Owens of bringing "addicts and alcoholics into the neighborhood" and stated that he had raised these concerns with Mr. Cauley. Another neighbor accused Mr. Owens of bringing "alcoholics, drug addicts, and pedophiles into our neighborhood." Mr. Owens attempted to assure the neighbors that this was not the case.

24. On July 18, 2019, Mr. Cauley wrote to Mr. Owens that "[i]t has come to my attention that Trinity Sober Living, LLC, has purchased property within the Village located at 111 N. Grant Street, and intends to use it as a facility where ten (10) unrelated people will reside." This, Mr. Cauley wrote, was a "prohibited use" and would not qualify even as a special use. Mr. Cauley's letter did not refer to the Village's reasonable accommodation process.

25. Mr. Owens asked to meet with Mr. Cauley, but received no response. However, on July 30, 2019, Mr. Owens met with Rob McGuiness, the Village's Planning Director, Bradley Bloom, the Assistant Village Manager and Public Safety Director, and Lance Malina, the Village Attorney, at the sober home at 111 North Grant Street. At the time, the home had only one resident.

26. During the meeting, Mr. Owens gave the officials a tour of the home and then answered numerous questions from the three Village officials in attendance on the sober living home and how it would operate. For example, in response to Mr. Malina's questions, Mr. Owens stated that Trinity would not admit sex offenders and explained why Trinity needed to have ten residents from both a therapeutic and financial perspective. In response to Mr. Bloom, Mr. Owens stated that Trinity would comply with the Village's parking regulations and that residents would not be allowed to stand in front of the house and smoke. Mr. Owens further confirmed that, other than weekly Alcoholics Anonymous meetings, all therapy and treatment would occur at Trinity's office and not at the home.

27. At the close of the meeting, Mr. Malina suggested that Trinity request a reasonable accommodation and referred to the Village's reasonable accommodation process, as well as the accommodation the Village granted in August 2017 and described in Paragraph 20 above. Mr. Owens agreed to do so and said that he would have his then-counsel, Steve Polin, a Washington, D.C.-based lawyer who specializes in representing sober homes, submit a request.

28. In a follow-up email exchange with Mr. Malina, Mr. Owens inquired whether, in the interim, Trinity would be complying with the zoning code if it limited itself to three residents, the maximum number of unrelated persons allowed to live as a "family" under the zoning code, not counting domestic servants. Mr. Malina responded as follows:

> To begin, *I do not agree that you can have any individual residents at the 111 Grant property that are customers of Trinity Sober Living, LLC, under Hinsdale's Zoning Code.* This follows from the fact that the Trinity Sober Living plan, to the extent you have informally described it to the Village, is a commercial use. We explained this to you at our meeting. Commercial uses are not allowed in the R-4 district. Because the residential use at 111 Grant is ancillary to the addiction treatment that is being marketed commercially to those seeking Trinity Sober Living's product, it is a commercial use.

> *Having up to only three unrelated people residing at the property -- even though you would like eleven -- does not eliminate the zoning violation triggered by the commercial use of the property. This would simply avoid violating yet an additional provision of the R-4 zoning requirements.*
>
> As I explained, you must follow the Village Code requirements until you get proper authorization to do otherwise. I need to know whether you will do this voluntarily. I understand you are now requesting until August 7, 2019, to respond. Please do so no later than 4 p.m. Chicago Time on Wednesday, August 7th; that is the end of the business day in Washington, D.C.

(Emphasis added.)

29. On August 4, 2019, the Village convened a meeting of Hinsdale residents in order to "share with the residents the actions that the Village has taken and intends to take with respect to" the sober home at 111 North Grant Street. The Village did not invite Trinity to the meeting.

30. At this meeting, the Village did not inform the residents that Trinity was expected to submit a request for a reasonable accommodation within the next few days or that the Board of Trustees would be considering this request.

31. On August 5, 2019, Mr. Cauley sent a letter addressed "Dear Residents" that stated that "the Village is prepared to take any and all actions necessary to enforce the Village's zoning code, under which this proposed use is not permitted." The letter did not state that the Village was expecting a reasonable accommodation request from Trinity in the next few days or that the Board of Trustees would be considering this request. The Village did not send this letter to Trinity until after Mr. Owens learned about it over a month later and asked the Village for a copy.

32. On August 7, 2019, the deadline agreed to by the Village, Mr. Polin sent Mr. Malina a seven-page letter by email. On the first page of the letter, Mr. Polin wrote, "I am writing this letter to request a reasonable accommodation pursuant to the Federal Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B) on behalf of TSL [Trinity Sober Living] and its prospective

9

residents, the owner of the property and its residents." The requested accommodation was to "waiv[e] the number of unrelated persons that can reside together as a family, and treat the use of 111 N. Grant Street as a single family use." The letter cited extensive legal authority for the proposition that group homes and sober living homes like Trinity were entitled to reasonable accommodations under the FHA, notwithstanding their "commercial" aspects. Mr. Polin received confirmation that evening that Mr. Malina had opened Mr. Polin's email transmitting the letter.

33. In contravention of the Village's reasonable accommodation process and past practice, the Village did not forward Trinity's reasonable accommodation request to the Board of Trustees. Instead, on August 8, 2019—the very next day—the Village filed a lawsuit against Trinity in the Circuit Court for DuPage County, Illinois to enforce its zoning code.

34. The Village's lawsuit claimed that, even though Trinity's sober home had fewer than three unrelated residents at the time of filing, it was nevertheless currently in violation of the zoning code because it was a "commercial" use. The lawsuit did not define what constituted a "commercial" use under the zoning code, but alleged that the sober home's residents "will pay rent, must work or enroll in school, and will be monitored 24/7 by Trinity."

35. Based on the apparent criteria used by the Village, most group homes for persons with disabilities would be considered a "commercial" use, regardless of the number of residents, and consequently barred from operating in single-family districts. This is because, for most group homes, the residents pay rent, the agency operating the group home receives compensation for the care and services being provided at the home, most residents must attend employment or day services programs during the day, and residents are monitored by the provider agency.

36. The Village's lawsuit sought a declaration that the home violated the zoning code and fines of $500 for "each and every day" the home was operating. The Village also later moved for a preliminary injunction "[r]equiring Defendant to cease all commercial use of the Property" and "enjoining Defendant from using the Property for a commercial use, or any other non-permitted use[.]" The Village voluntarily moved to dismiss this lawsuit on June 15, 2020, and it is no longer pending.

37. At no time during the state court proceedings, which lasted over ten months, did the Village inform the court that it had received or intended to consider a reasonable accommodation request from Trinity pursuant to the Fair Housing Act, which, if granted, would have mooted some or all of the Village's claims. To the contrary, the Village repeatedly disputed the Fair Housing Act's relevance or applicability to the Village's enforcement of its zoning code.

38. On August 12, 2019, after the Village had filed its lawsuit in state court, Mr. Malina responded to Mr. Polin. Mr. Malina requested that Trinity provide him with the home's "operational plan," leases, and "any rules in place for residents." At least some of the requests for documents concerned topics that had been discussed during the July 30, 2019 meeting between Trinity and Village officials, including Mr. Malina. Mr. Malina did not ask for any information about the residents' disabilities or their need for the requested accommodation, and did not explain why the information he requested was relevant to Trinity's reasonable accommodation request. Mr. Malina stated that, once he received this information, he would "review your request" and "respond accordingly in more detail."

39. Trinity provided the requested information on October 31, 2019. The Village, however, did not respond further, nor did it refer the request to the Board of Trustees, consistent

11

with the Village's process for addressing requests for reasonable accommodations in zoning and land use.

40. On November 13, 2020, the Village stated that, in response to the United States' notice of the filing of this lawsuit, it was now changing the position it has taken for the past one and one-half years, and now claims that it opposes Trinity's right to operate in a single-family district only because it intended to serve more than three unrelated persons, and not because the Village regards Trinity as a "commercial use." The Village made clear that it was not withdrawing any of its other positions with respect to Trinity, including its refusal to consider Trinity's reasonable accommodation request. Even under this new position, the Village's actions would still preclude all but the smallest group homes from operating. For example, under Illinois law, group homes for persons with mental illness or intellectual disabilities may serve up to eight residents. 210 Ill. Comp. Stat. § 135/3(d). Furthermore, as stated above, sober living homes typically require more than three individuals to succeed therapeutically.

## V.

## CLAIMS FOR RELIEF

### Count I: Violations of the Fair Housing Act

41. The allegations listed above are incorporated herein by reference.

42. Trinity's sober living home was a "dwelling" within the meaning of 42 U.S.C. § 3602(b).

43. The residents who lived at Trinity's sober living home, as well as those individuals who applied to live at the home, were persons with disabilities within the meaning of 42 U.S.C. § 3602(h).[1]

---

[1] Throughout this Complaint, the United States uses the term "disability" instead of "handicap." For purposes of the FHA, the terms have the same meaning. *See Helen L. v.*

44. Defendant Village of Hinsdale's actions described above constitute:

    a. discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);

    b. discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of disability, in violation of the FHA, 42 U.S.C. § 3604(f)(2); and

    c. a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B).

45. Defendants have acted intentionally, willfully, and in disregard for the rights of others.

46. Defendant's actions as described above constitute a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, or a denial of rights protected by the Fair Housing Act to a group of persons, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

47. Trinity Sober Living, the residents of Trinity's sober home, and other persons and/or agencies who may have been the victims of Defendant's discriminatory conduct are

---

*DiDario*, 46 F.3d 325, 330 n.8 (3d Cir.) ("The change in nomenclature from 'handicap' to 'disability' reflects Congress' awareness that individuals with disabilities find the term 'handicapped' objectionable."), *cert. denied sub nom.*, *Pa. Sec'y of Pub. Welfare v. Idell S.*, 516 U.S. 813 (1995).

"aggrieved persons" within the meaning of 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B), and have suffered harm and damages as a result of Defendant's conduct.

WHEREFORE, the United States prays that the Court enter an order:

a. Declaring that the Defendant's actions violate the Fair Housing Act;

b. Ordering the Defendant to take all affirmative steps to ensure their compliance with the Fair Housing Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of their unlawful housing practices as described herein;

c. Ordering the Defendant to take all affirmative steps to restore, as nearly as practicable, the victims of the Defendant's unlawful practices to the position they would have been in but for the Defendant's discriminatory conduct;

d. Awarding monetary damages, pursuant to 42 U.S.C. § 3614(d)(1)(B), to all aggrieved persons; and

e. Assessing a civil penalty against the Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

Dated: November 24, 2020

                                              Respectfully submitted,

                                              WILLIAM P. BARR
                                              Attorney General

| | |
|---|---|
| JOHN R. LAUSCH JR.<br>United States Attorney<br>Northern District of Illinois | ERIC S. DREIBAND<br>Assistant Attorney General<br>Civil Rights Division |
| | s/ Sameena Shina Majeed<br>SAMEENA SHINA MAJEED<br>Chief, Housing and Civil Enforcement<br>   Section |
| s/ Kathleen Flannery<br>PATRICK JOHNSON<br>KATHLEEN FLANNERY<br>Assistant United States Attorneys<br>United States Attorney's Office<br>Northern District of Illinois<br>219 South Dearborn Street, Fifth Floor<br>Chicago, IL 60604<br>Tel: (312) 353-5327<br>PJohnson3@usa.doj.gov<br>KFlannery@usa.doj.gov | s/ Max Lapertosa<br>TIMOTHY MORAN<br>Deputy Chief<br>MAX LAPERTOSA<br>Attorney<br>United States Department of Justice<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>950 Pennsylvania Ave. NW – 4CON<br>Washington, DC 20530<br>Tel: (202) 305-1077<br>Fax: (202) 514-1116<br>Max.Lapertosa@usdoj.gov |